S. J. WYMAN *vs.* CARRABASSETT HARDWOOD LUMBER COMPANY.

*A, by oral agreement only, agreed to sell certain real estate and personal property to B
at a certain price agreed upon, and executed a deed of the real estate and a bill of
sale of the personal property in accordance with the trade, and left them with
C to be delivered to B upon payment of the purchase price. The pur-
chase price was never paid or tendered and no title passed. B
entered into an oral agreement with D to sell the personal
property and to lease the real estate, and D went into
possession of both the real estate and personal prop-
erty, but failed to perform any of his agreements
and used, consumed, and disposed of
some of the personal property. A is
entitled to recover of D the
damages sustained.*

The conclusion of the court is that the plaintiff is entitled to recover the value of
his personal property delivered by him to the Timberland Company and
delivered by the Timberland Company to the defendant company.

On report. This is an action in trover for the value of articles of
personal property alleged to have been taken and converted by
defendant. Plaintiff owned several farms and personal property on
and about them in Franklin County, and agreed orally to sell the
whole property both real estate and personal property to the Carra-
bassett Timberland Company for $10,500. The plaintiff executed a
deed and bill of sale, in accordance with the trade, and left them with
the First National Bank of Farmington for delivery to said Timber-
land Company upon payment of the purchase price. The money for
the purchase price was never paid or tendered and no title passed.
Subsequently the Timberland Company entered into negotiations
with the Carrabassett Hardwood Lumber Company which agreed to
purchase all the personal property and lease the real estate and
execute stumpage permits of the Timberland Company. This
agreement was an oral one only, and not enforcible, and the Hardwood
Company failed to perform any of its agreements.

The Hardwood Company, however, through its president entered into possession of the farm and took into his custody various articles of personal property, and used, consumed and disposed of them as the property of his company.   Judgment for plaintiff.

The case is fully stated in the opinion.

*W. B. Skelton and S. P. Mills,* for plaintiff.

*F. W. Butler,* for defendant.

SITTING:  CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

SPEAR, J.   This is an action of trover for the value of a long list of articles of personal property alleged to have been taken and converted by the defendant company.

The alleged cause of action came about as follows:   The plaintiff owned certain farms in Franklin County with camps thereon, together with all the personal property claimed in his writ.   Through a real estate agent he agreed to sell the farms and personal property for the sum of $10,000, net to himself.

Later, about September 20, 1920 the plaintiff and the Carrabassett Timberland Company were brought together and entered into an oral contract for the sale and purchase of the property at the price of $10,500.   The plaintiff executed a deed and bill of sale, in accordance with the trade, which he left with the First National Bank of Farmington for delivery to his grantee upon payment of the purchase price.   No other writings were made, the purchase money was not paid or tendered, and no title ever passed in pursuance of this agreement.

In the meantime and unknown to the plaintiff, the Timberland Company had entered into negotiations with the Carrabassett Hardwood Lumber Company, whereby the latter company agreed to purchase all the personal property, take a lease of the farm from the Timberland Company and execute certain stumpage permits.

The Hardwood Company failed to perform any of its agreements. Its agreement was oral, and not enforcible.   The breach of agreement resulted in the neglect of the Timberland Company to take and pay for the farm and personal property as it, in the outset, had agreed to do, though not by an enforcible contract.   Within a few days after the Timberland Company and the Hardwood Company had com-

pleted their agreement of supposed sale and purchase, the president of the Hardwood Company entered into possession of the farm and took into his custody the various articles of personal property, and used, consumed, and disposed of them as the property of his company.

Several weeks after the original understanding between the plaintiff and the Timberland Company, the president of the Hardwood Company made a check for $600, payable to the Timberland Company on account of the sale price of the personal property. This check was delivered to the attorney of the Timberland Company, but the plaintiff had nothing to do with it. Nothing further was ever done toward paying the plaintiff for his real and personal property.

Upon the farm when the defendant went into possession was live stock composed of team horses, cows, sheep, calves, pigs and hens.

All the personal property of the alleged conversion was attached on the plaintiff's writ, except what had been destroyed or lost.

The plea was the general issue with a brief statement: First, that the defendant was a tenant, and that trespass not trover was the plaintiff's form of remedy. Second, that the defendant while in the legal possession fed a large part of the hay to the stock of the plaintiff. Third, that the hay, grain and stock was delivered to the defendant by the plaintiff or with his consent, and that he is equitably estopped. Fourth, (consolidating several specifications), that the plaintiff had knowledge of the delivery of all of said personal property to it, by the Carrabassett Timberland Company, and made no objection to the defendant corporation receiving said property, using and improving it, or feeding the hay and grain to said stock, and that he has waived or is now equitably estopped from making any claim thereto.

The only specifications which it is necessary to consider in framing the issues involved are the general issue, which raises the questions of fact as to whether the plaintiff had notice of the taking, waived objection or was estopped.

The case comes up on report, thereby investing the court with jury powers in deciding all questions of fact.

It is conceded that no demand was made.

The case accordingly, is resolved into the following propositions: First, was the taking by the defendant tortious? Second, if not was it waived? Third, if not waived, was he estopped?

At the outset it cannot fail of note that the evidence shows that the equites in the case predominate strongly in favor of the plaintiff. Both the Timberland Company and the defendant company trifled with his rights. The sale was a cash transaction and neither company had a right to take possession of and use his property, until one or the other had paid for it, or by such possession and use, assumed a moral responsibility to pay for it, which the plaintiff had a right to respect and regard as a guarantee of payment. We are, therefore, of the opinion that the taking by the defendant was tortious, even if the plaintiff knew it, and knew the defendant's use of it. He had a right to assume and expect, under the trade he had made and the deposit of his deeds, that the purchaser would shortly pay for the property, and was justified in regarding the Timberland Company in the meantime, as the owner of it, with a right to do what it pleased with respect to it. He had no occasion to think that the purchaser, without notifying him that it was not going to pay for the property as it had agreed to, would put his property into the possession of another corporation, without making any arrangement whereby he was to be paid.

But it may be said the plaintiff was charged with knowledge that the Timberland Company was not legally bound to pay for the property. True, and the Timberland Company was equally charged and consequently had no legal right, under the guise of a contract which they did not intend to carry out, to give possession of his property to the defendant. The plaintiff had no privity of contract, whatever with the defendant. He relied and had a right to rely upon the word and action of the Timberland Company. It would be a distortion of justice to permit these two corporations to thus allure the unsuspecting plaintiff into substantial loss and then drop him because they were not legally bound by the agreement by means of which they had led him into the trap, nor does the law permit it.

The contention of the plaintiff is confirmed by his positive testimony as well as the overwhelming probabilities of the transaction. On cross-examination he said:

Q. "During that time (at a former hearing) were you asked this question: 'Did you object to Mr. Beedy turning it over to Newcomb?' and did you answer: 'After they had taken some of the stuff Beedy spoke to me about it, and I told him it was all right because Newcomb had bought the stuff of the Carrabassett Lumber

Company, who had bought the property from him (me) and I expected to get my pay for it in a few days'." He said he did.

This answer is made the backbone of the defense. It was, however, in exact harmony with what the plaintiff believed, and had a right to believe, was the fact in regard to his sale of and expected pay for his property. The plaintiff says that if he had received his check that is all there would have been to it. But he was looking all the time, and expecting the check from the Timberland Company. He says he never recognized the Hardwood Company in any way with respect to any responsibility upon it for payment for the property, nor is there any claim that he did. He regarded what was going on between the Timberland Company and the Hardwood Company as their affair and not his. He undoubtedly thought, as any reasonable man might, that these two companies would not sell, buy, take possession, and exercise dominion over his property, under color of an agreement to buy or pay him for it, unless his vendee was going to pay for it as it had agreed to.

He had no occasion to have either care or solicitude with reference to what the Hardwood Company might do with the property. His trade was with the Timberland Company.

No member or representative of the Timberland Company took the stand to contradict either the word or spirit of the plaintiff's contention. And only one witness, an employee of the defendant took the stand in defense, and the only effect of his testimony in its bearing upon the legal aspect of the case was, that he called the plaintiff up on the phone, and "told him the things on the Spring Farm we wanted to use and wanted to know what about them," and he says, "It is all right to use it." The object of this testimony was to show that the defendant before it exercised dominion over any of the personal property on the farm obtained permission of the plaintiff so to do. If it were so it would not change the legal status of the parties as the plaintiff was at that time acting upon the hypothesis that the property was not his, but sold to the Timberland Company, and there is no proof that he knew or had been notified to the contrary, at that time. The testimony of the defendant witness is flatly contradicted by Wyman as well as by all circumstances and probabilities in the case. The burden being on the defendant, we feel no hesitancy in determining as a matter of fact that, upon this issue, the defendant has failed to sustain it.

Under the above facts and circumstances was the taking by the defendant tortious? The vendee, the Timberland Company, was to receive title to the real and personal property upon payment to the plaintiff of the price agreed upon. It could convey no title until that price was paid. Hence, its negotiations with the Hardwood Company, were unauthorized, null and void, and made the delivery of the property by it to, and the reception of it by, the defendant Company, a tortious taking and possession.

In 26 R. C. L., Page 1122, Section 33, the rule of law, applicable to the facts in the present case, is stated as follows: "Thus it has been held that demand and refusal prior to the bringing the action in trover, need not be shown when an innocent purchaser of goods from one who had no title had sold the same, or has exercised ownership by letting the property, or when it appears that the defendant purchased the property of one who had no right to sell, and holds it to his own use." Under these principles are cited many cases, among which is *Crocker* v. *Gullifer*, 44 Maine, 491, in which it is held:

"The sale being conditional,—that no title shall pass till the vendee pay the price of the article sold and delivered, the vender, if guilty of no laches, may reclaim the property, even from a vendee in good faith and without notice, *Coggill* v. *New Haven Railroad Company*, 3 Gray, 545. The chattel in such case is in the constructive possession of the seller, and an action may be maintained without demand in case of a conversion by the purchase, *Hill* v. *Freeman*, 3 Cush., 257."

It is further said in *Galvin* v. *Bacon*, 11 Maine, 30:

"Whoever takes the property of another without his consent expressed or implied, or without the assent of some one authorized to act for him, in his behalf, takes in the eye of the law tortiously."

The defendant so took the plaintiff's property.

In *McPheters* v. *Page*, 83 Maine, 234 we find this principle:

"It is established as elementary law by well settled principles and a long line of decisions that any distinct act of dominion over property in denial of the owner's right, or inconsistent with it, amounts to a conversion." The use made of the plaintiff's personal property by the defendant was inconsistent with the plaintiff's rights and was therefore a conversion.

The foregoing rules of law must be regarded as decisive of the tortious taking and possession of the plaintiff's property by the

defendant as purchaser. The taking of possession under the circumstances of the present case, being tortious it follows that the conversion was co-incident with the taking, and establishes the plaintiff's right of action as accrued at that time. Consequently no demand was necessary as a condition precedent to his right of action.

We are, therefore, of the opinion that the evidence amply proves that the taking of the plaintiff's property by the defendant was tortious.

The case might stop here were it not that the questions of waiver and estopped are raised.

The undisputed facts, as stated by the attorney for the Timberland Company proves that the company in the language of the attorney, "did not care to own any personal property and did not care to have the control of any of the buildings there, and they did not wish to enter into any contract with Mr. Wyman unless they could consummate the trade with the Hardwood Lumber Company by which the personal property should be taken from their hands and the buildings leased." Not a word of this ex-parte intention was communicated to the plaintiff. But when the Hardwood Company failed to pay, the Timberland Company refused to pay and, although it had sold and delivered Wyman's property according to its secret plan, it left him to the financial mercies of a corporation of which it did not receive its pay and to which it would not give credit.

Under the statement of the attorney, the neglect to give notice of its secret purpose, and its subsequent acts, the Timberland Company never had, even the color of title, to the plaintiff's property.

Is it reasonable to suppose that Mr. Wyman, apparently as well situated to know of the financial condition of the Hardwood Company as the Timberland Company, would have been any more willing to waive, and to subrogate, the credit of the former company for that of the latter, than the latter was to give credit? It was not probable nor did he do so. Wyman had no knowledge of any secret agreement, whereby the Timberland Company was going to exploit his property to its advantage if it could, and turn him over to a company it would not trust for $2,000 if it couldn't.

Upon the point of Wyman's knowledge of this secret deal, and waiver claimed to be based thereon, the attorney, who represented the Timberland Company in a part of the negotiations testifies:

Q. (BY THE COURT). "Very true, but so far as you are familiar or were familiar with the transaction, whatever dealing there may have been between the Timberland Company on the one side and the Hardwood Company on the other part, may have been entirely independent of any knowledge of such transaction on the part of Mr. Wyman, or any relation on his part to that particular transaction?"

A. "I don't, I wouldn't, I don't know."

Q. "By same, that is what I supposed."

A. "Yes."

Following this, upon recall immediately after the attorney had testified, Mr. Wyman took the stand and said:

Q. "Did you know anything about any proposed arrangement between the Timberland Company and the Hardwood Lumber Company?"

A. "I did not know anything about any arrangement they had made, whatever." And the only reason why the Timberland Company did not stand by its trade with Mr. Wyman was the failure of the execution of its mental reservation with the Hardwood Company as stated by its attorney.

Q. "Was the failure of the Timberland Company to take the deed, (which Wyman had left at the bank) and pay the purchase price, (to Wyman) due to anything except the failure of the Hardwood Company to carry out its part?"

A. "That is all. I had the funds in my possession to pay the whole thing."

We have thus fully commented upon this connection of the Timberland Company with this transaction to show that the ex parte purpose of the company, in buying the property, was not in any way communicated to the plaintiff; that the plaintiff acted in the dark with respect to the mental reservation of the Timberland Company in its apparent sale to the defendant company, and consequently made no objections to what the defendant was doing with the property, upon the reasonable belief that, since the Timberland Company had delivered all the personal property to the defendant, it had sold it in good faith, and in due time, would pay the bank the money and take its deeds. For in order to get its title it was not necessary to see or confer with Wyman. He, therefore, was justified in waiting, without suspicion of anything wrong, expecting to receive his pay.

Accordingly, as the undisputed evidence proves, whatever was known and done by the plaintiff, between the time of the apparent sale and the discovery by him that the Timberland Company had delivered his property to the defendant upon a conditional sale; and that it did not intend to pay him for his property; the plaintiff was acting in good faith; and whatever he did by silence, knowledge, or consent, was based upon the hypothesis that the property belonged to the defendant by right of purchase from the Timberland Company. In the meantime, he did not know or claim he had any rights to waive. He was led to believe until too late, to his sorrow, that this property was not his; that it was the property of the Timberland Company or its grantees. By the obvious exercise of their dominion he had a right to believe this. In fact, under his agreement, and in view of the deposit of his deeds, ready for delivery, it is not easy to see how he could have thought anything else. But it may be said the deeds had not been accepted and the price paid. True, but he was perfectly willing to trust the Timberland Company as the evidence shows. He says:

"I thought it was all right for him to take some of the personal property, because I expected a check from the Carrabassett Timberland Company to pay for the real and personal estate and personal property." What reasonable man would have expected anything else?

In fine the situation, itself, speaks louder than any evidence could upon the question of waiver. Is it supposible for a moment that the plaintiff, had he known that the Timberland Company was going to make its agreement and never pay him for his property, would have voluntarily relinquished the use, control and custody of this property to the defendant company?

Reading between the lines will amply disclose that the reason that influenced the Timberland Company to refuse the credit of the defendant, would have equally actuated the plaintiff to follow the same course. The evidence upon the question of waiver does not show, on the part of the plaintiff, the voluntary relinquishment of a known right. Nor were there any acts of estoppel. The defendant contends that the plaintiff after the defendant went into possession took $600 from it in part payment for his personal property. We find no evidence to support that contention, but just the contrary. The check was payable to the attorney for the Timberland Company who testified on cross-examination as follows:

Q. "Follow that right along. How do you understand the check came about to be brought to you for the $600?"

A. "I think that check was brought to me because of the delay in consummating the trade and the fact that the Hardwood Lumber Company was using up some personal property and it was desired for the protection of Mr. Wyman."

Q. "Mr. Wyman's agent procured it of Mr. Newcomb and brought it to you?"

A. "He brought it to me."

Note that the answer was not yes. The attorney as will in a moment appear would not say that A. P. Richards was Mr. Wyman's agent.

The Court.

"A. P. Richards brought it to him. From what source he got it, he didn't know."

Q. "He brought you the check for the Hardwood Lumber Company?"

A. "He did."

By the Court.

Q. "And Mr. Richards was acting all the while as I understood him for the Timberland Company?"

A. "Yes, your Honor."

This answer proves whose agent A. P. Richards was in procuring the check.

Again he testified.

Q. "What was the check given you for?"

A. "It was to be ultimately applied in part payment of the personal property which the Hardwood Lumber Company was to receive from the Timberland Company."

The foregoing questions and answers tell the whole story of this case. The last answer shows conclusively that the Timberland Company understood that it had delivered to the Hardwood Company the personal property it had agreed to buy of the plaintiff, and that the defendant was using it up, and obtained, rather than merely took, the check in part payment. This check transaction was the business of the Timberland Company not of the plaintiff, Wyman.

Another statement in this testimony is very significant:

"I think that the check was brought to me because of the delay in consummating the trade." What trade? Between itself and the Hardwood Company. There was no other trade.

This evidence alone, throws a flood of light upon the whole transaction, and proves that these two companies were negotiating and exercising dominion over this personal property without the slightest regard to Wyman's interest, because at that time the only difficulty between them was the delay.

The check transaction was sometime after the defendant had taken over and was using the personal property. The two companies had not even at this time abandoned the transaction. It was apparently in the process of consummation. As was testified by A. P. Richards who says he was a "go between" for these companies in regard to the check transaction as follows:

"After talking with him (Mr. Newcomb) up there he decided that their price was all right and that he would take it at their figure and sign the lease which he had agreed to do before, but had failed to do it, and on the strength of that he gave me this check of $600."

It is perfectly obvious that Wyman's connection with the $600 check affords no evidence whatever of an estoppel, unless it be upon the defendant. On the contrary the delivery of this check in part payment for the personal property stamps the contention of the defendant, that it did not claim the property as its own, but was using it by the consent of the plaintiff, as absurd, and inconsistent with the workings of a sane mind in the transaction of business. Six hundred dollars is a substantial sum of money to be paid on a twenty-five hundred dollar account, as this sum was understood to be paid by Newcomb, as shown by the above testimony of A. P. Richards.

We find no evidence of estoppel. Our conclusion accordingly is that the plaintiff is entitled to recover the value of his personal property delivered by him to the Timberland Company and delivered by the Timberland Company to the defendant company.

But the case shows that the plaintiff has presented a list of articles, which he claims were converted by defendant; he divides them into three classes: (1) Articles "entirely used up"; the value of these except the crops not harvested, he is entitled to recover; (2) Articles "left in a damaged and depreciated condition"; (3) Articles "not materially injured." The plaintiff has been in possession of the farm and the articles of personal property embraced in classes (2) and (3) since January 1, 1921. He disclaims any injury to the articles embraced in class (3). He testifies as to the depreciated values of articles embraced in class (2), and refers to both classes of articles as taken back.

Accordingly he is not entitled to recover anything for the uninjured articles of the third class; he does not claim any injury to them. As to the articles of the second class, their value at the time the plaintiff retook them should be allowed in mitigation of damages. The title to the articles in both second and third classes is still in the plaintiff; he has never lost it, and the articles are now in his possession.

> *Judgment for the plaintiff for the value of the articles, except the crops not harvested, listed in classes (1) and (2), after allowing in mitigation of damages the value of the articles of the second class at the time plaintiff retook them.*
>
> *Case remanded to nisi prius for assessment of damages only, in accordance with this opinion.*